IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION FILE NO. |
| | : | |
| TELLY MONTANA JACKSON, | : | 1:17-CR-00065-LMM-AJB |
| a/k/a Telly Pritchett, | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES MAGISTRATE JUDGE'S**
**FINAL REPORT AND RECOMMENDATION**

Defendant is charged in a single count indictment with possessing a firearm on June 1, 2016 after having been convicted of one or more felony offenses, in violation of 18 U.S.C. §§ 922(g) and 924(e)(1). [Doc. 1]. He moves to suppress several statements that he is alleged to have made to Atlanta Police Department (APD) officers at the time he was allegedly found in possession of the weapon. [Doc. 15]. The Court held an evidentiary hearing, [Doc. 25 (hereinafter "T_")], after which the parties filed briefs. [Docs. 30 (Jackson), 34 (Govt.)].[1] For the following reasons, the undersigned **RECOMMENDS** that the motion be **DENIED IN PART AND GRANTED IN PART AS MOOT**.

---

[1]   Defendant did not file a reply brief. (*See* Dkt.).

AO 72A
(Rev.8/8
2)

*Facts*

On June 1, 2016, between 7:00 and 7:30 a.m., then-APD Officer Thompson, who was dressed in his APD uniform, responded to a dispatch call placed to APD Officer Rosser[2] about a person at 1898 Memorial Drive. T3-5, 16-17.[3] The call reported a male with red shoes laying on the front porch of this address, and based on the description, Thompson believed that he knew the individual–Defendant Jackson–and had prior dealings with him a few days before that when Defendant was aggressive or irate towards the officers' supervisor and Rosser. T5-6, 17, 29. Thompson arrived at the address within five minutes of the call, and parked his patrol car at a business across the street from the address. T6, 17-18. His blue lights were not on. T18. He knew that the address was not Defendant's home but that he was usually on that street. T29. From the vantage point from where he parked his vehicle, Thompson observed a black male with red shoes sitting on the steps of the address, and upon approaching the individual, Thompson recognized him as Defendant. T6-7, 18. From his previous dealings with him, Thompson knew that Defendant was a convicted felon. T8.

---

[2] As of June 1, 2016, Rosser was known by her maiden name of Welch. T31. The Court refers to her current name in this R&R.

[3] Thompson was Rosser's beat partner, and they backed up each other. T17.

Once he approached Defendant, Thompson saw that he was asleep and roused him. T19. Defendant did not appear to Thompson to be under the influence of alcohol or drugs. T29. Thompson told him to get up and leave the property. T8, 19. Defendant quickly complied, and they began walking together down the driveway, with Thompson slightly trailing Defendant. T8-9, 20. Thompson did not remember whether he or Defendant carried Defendant's bookbag. T8-9, 19-20. Since, as will be shown in the next paragraph, Thompson placed the bookbag on top of the firearm subsequently dropped by Defendant, the Court concludes that Thompson was carrying Defendant's bookbag down the driveway.

A few steps into their descent of the driveway, Thompson heard a "clank" on the driveway's concrete, and when he looked down towards the sound, he saw a revolver. T9, 20. Thompson directed Defendant to step away from the gun and placed Defendant's bookbag on top of it. T10-11, 22. Defendant moved about five feet away. T15, 20, 21. Thompson did not get on the radio to report these events because he knew that Rosser was on her way. T21. Defendant was not handcuffed because Thompson did not perceive Defendant as dangerous at that point. T11, 23, 24.

Defendant told Thompson to "let it slide," which Thompson interpreted as meaning to let him take the gun and leave, and Thompson responded that he could not

3

do that. T11-12, 22.[4]  Defendant also stated that the gun was not his, and that it belonged to "Red." T11.

Rosser[5] arrived at that location five to six minutes after the dispatch call. T13, 32. She parked her police vehicle across the street where Thompson's was parked. T13, 23-24, 39. She also did not turn on her blue lights. T40.[6] She saw Thompson and Defendant standing in the driveway standing one to two feet from one another. T32, 33 40. She knew Defendant from a panhandling call before June 1. T32. Thompson told Rosser what had happened, that he had Defendant walk down the driveway and as he was doing that, the firearm fell from Jackson's right side. T14, 27.[7] He told Rosser

---

[4] Defendant argues that Thompson's testimony that Defendant asked to "let it slide" is not credible. [Doc. 30 at 2 n.4]. At stated at the evidentiary hearing, the issue for the undersigned is whether the statements that the government claims Defendant made are subject to suppression on Fifth or Sixth Amendment grounds. T53. Whether he made those statements is for the jury to decide at Defendant's trial if the statements are deemed by the District Judge to have been constitutionally obtained.

[5] At the time of the evidentiary hearing, Rosser was retired from the APD. T30-31.

[6] Neither police vehicle was parked in a way that allowed the encounter with Defendant to be recorded by a dashboard camera. T25, 39-40

[7] Rosser testified that Thompson did not tell her what had transpired before her arrival until they were escorting across the street. T42, 44. The timing of the debrief is irrelevant to resolution of the issue presented by Defendant's motion.

4

to remove the bookbag from his foot and when she did so, underneath she saw a firearm under Thompson's foot. T34, 41. Shortly after this debrief, Defendant was walked across the street to the police cars, where he was handcuffed. T14, 35. Prior to being handcuffed, neither Thompson nor Rosser touched Defendant. T28, 38.

Neither Thompson nor Rosser *Mirandized* Defendant. T15, 37. At some point, the bookbag was inventoried and found to contain Defendant's identification. T26.

Rosser testified that she was present when either she or Thompson asked Defendant where he got the gun and Defendant replied from Red. T36-37, 43, 44.

### *Arguments of the Parties*

Defendant argues that he was in custody as soon as Thompson saw the firearm in the driveway and directed him to move away and wait for the other officer to arrive. [Doc. 30 at 5]. At a minimum, he argues, he was in custody when he was taken across the street by the officers. [*Id.*]. As a result, he contends that he was entitled to *Miranda* warnings, and since he was given the warnings, any statements that he allegedly made cannot be admissible against him in the government's case in chief. [*Id.* at 5-6].

In response, the government argues that the statements that Jackson made to Thompson–(1) let it slide, (2) the gun did not belong to him, and (3) it belonged to

5

Red–were non-custodial statements, and even if he was in custody, they were voluntary and spontaneous and not in response to interrogation or its functional equivalent, and so *Miranda* warnings were not required. [Doc. 34 at 9-10]. The government is not seeking to introduce Jackson's statement made in response to inquiry from either Thompson or Rosser, that is, where did he get the gun and his response, "Red." [*Id.* at 2 & n.1].[8]

### *Discussion*

The procedural safeguards of *Miranda v. Arizona*, 384 U.S. 436 (1966), are required only in instances of custodial interrogation. *United States v. Moody*, 977 F.2d 1425, 1434 (11th Cir. 1992); *see also Endress v. Dugger*, 880 F.2d 1244, 1248 (11th Cir. 1989) (*Miranda* warnings are required only in the situation of a custodial interrogation). Therefore, the Court must determine if Jackson was in custody and being questioned at any time when he made the statements that the government intends to introduce at trial. *United States v. Adams*, 1 F.3d 1566, 1575 (11th Cir. 1993) ("Since the warnings are required only in the situation of a custodial interrogation, many courts have addressed the issues of when a person is in 'custody' or has been 'interrogated'

---

[8] Defendant did not move to suppress any evidence on Fourth Amendment grounds. (*See* Dkt.).

6

for the purposes of *Miranda*.") (quoting *Endress*, *id.*).

### *Jackson was not interrogated*

"Interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). " 'Voluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning.' " *United States v. Sanders*, 315 Fed. Appx. 819, 823 (11th Cir. Feb. 24, 2009) (quoting *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991)); *see also Miranda*, 384 U.S. at 478. Defendant bears the burden to show that he was in custody and subjected to governmental questioning. *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant

7

voluntarily waived his privilege against self-incrimination.")[9]; *United States v. Peck*, 17 F. Supp. 3d 1345, 1353-54 (N.D. Ga. 2014) (Totenberg, J.) (gathering authority).

In the present case, there is no evidence that Thompson questioned Jackson or engaged in the functional equivalent of questioning when Jackson voluntarily and spontaneously asked Thompson to let him slide, and stated that it was not his gun but Red's. The record reveals that the only statements that Thompson arguably made to Jackson was that he needed to get up and leave the premises, and, after the firearm was discovered, that Thompson could not let it slide and directing Jackson to walk away from the firearm and wait for the other officer to arrive. These statements do not demonstrate questioning or its functional equivalent under *Innis* required to mandate that *Miranda* warnings be given. Accordingly, the motion to suppress as to the statements that the government intends to introduce at trial should be denied.

### *Jackson was not in custody*

Even if Thompson's statements to Jackson constituted questioning or the functional equivalent thereof, Jackson was not in custody for *Miranda* purposes at least until he was walked across the street by Thompson and Rosser to their police cars. The

---

[9] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981).

Supreme Court in *Miranda* held that the Fifth Amendment requires "the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984). *Miranda* does not apply, however, "outside the context of the inherently coercive custodial interrogations for which it was designed." *Id.* (internal quotation marks omitted).

The Eleventh Circuit has explained that "although a reasonable person in the defendant's position may feel constrained not to leave . . . —and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010). Rather, *Miranda* warnings are required only where the totality of the circumstances shows that a reasonable person in the defendant's position "would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* (internal quotation marks omitted); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983) (recognizing that an individual is considered to be "in custody" for purposes of receiving *Miranda* protection where "there is a formal arrest or restraint on freedom of movement of the degree associated

with a formal arrest.") (quotation marks omitted); *United States v. Lopez-Garcia*, 565 F.3d 1306, 1316 (11th Cir. 2009) (same). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant," *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996); and " 'the reasonable person from whose perspective "custody" is defined is a reasonable innocent person.' " *United States v. Jayyousi*, 657 F.3d 1085, 1109 (11th Cir. 2011) (quoting *Moya*, *id.*).

Several factors guide the determination of whether an environment is coercive enough to be custodial. For instance, "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the [defendant]'s home." *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006) (alteration and internal quotation marks omitted); *see also Luna-Encinas*, 603 F.3d at 882 (same). Whether a defendant was "[u]nambiguously advis[ed] . . . that he [wa]s free to leave and [wa]s not in custody" is another "powerful factor" that "generally will lead to the conclusion that the defendant [wa]s not in custody." *Brown*, 441 F.3d at 1347. Other relevant factors include "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," *United States v. Street*,

10

472 F.3d 1298, 1309 (11th Cir. 2006) (internal quotation marks omitted); as well as whether the defendant was physically restrained and the duration of the interview. *See Luna-Encinas*, 603 F.3d at 881; *Brown*, 441 F.3d at 1349. "An interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." *United States v. Matcovich*, 522 Fed. Appx. 850, 851 (11th Cir. July 3, 2013) (quoting *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (quotation marks omitted)). Again, the defendant bears the burden of establishing that he was in custody. *de la Fuente*, 548 F.2d at 533 (holding that "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988).

      In this case, Jackson was not in custody when he was detained on the driveway prior to being walked across the street by the officers. Although the residence that he was told he had to leave was not his home, it was on the street where he had previously been present, and more importantly, his encounter with Thomson was in public and in the daytime. *Cf. United States v. Crawford*, 294 Fed. Appx. 466, 474

11

(11th Cir. Sept. 19, 2008) (holding defendant was not in custody during traffic stop where, *inter alia*, the questioning occurred in public, there were no physical restraints, and the officers did not draw their guns); *see also Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) (mentioning that a motorist in a "typical traffic stop" does not "feel[ ] completely at the mercy of the police" due in part to being in public as one reason among others to illustrate why such a stop does not normally render a person "in custody"); *United States v. Beltran*, 367 Fed. Appx. 984, 988 (11th Cir. Mar. 4, 2010) (holding that defendant not in custody for *Miranda* purposes, when he was questioned by police officers regarding contents of his pocket and vehicle parked in driveway; although suspect was handcuffed, there were no significant pressures during questions that would have sufficiently impaired his ability to exercise his privilege against self-incrimination), *cert. granted, judgment vacated on other grounds*, 562 U.S. 1128 (2011); *United States v. Parker*, No. 1:10-cr-176, 2010 WL 5313758, at *10 (N.D. Ga. Nov. 18, 2010) (King, M.J., *adopted by* 2010 WL 5313449 (N.D. Ga. Dec. 17, 2010) (Carnes, J.) (concluding defendant was not "in custody" where law enforcement had firearms drawn briefly, handcuffed defendant, questioned the defendant in public, and used a laid back tone).

Second, although he was not told that he was free to leave or not under arrest, he

12

also was not told that he was under arrest. At most, he was told to remain a safe distance from the firearm until another officer arrived. This "restraint," such as it was, falls far short of restraints on a suspect's freedom of movement found in other cases where the suspects were deemed to be not in custody. *See Luna-Encinas*, 603 F.3d at 881-82 (defendant not in custody for *Miranda* purposes when he was detained for approximately five minutes in a neutral outdoor location, no handcuffs were employed, no guns were drawn, and defendant did not ask to leave or tell the officers he did not want to comply with their requests); *United States v. Acosta*, 363 F.3d 1141, 1148-50 (11th Cir. 2004) (defendant not in custody for *Miranda* purposes where officers retained defendant's license to check his identity; took and retained defendant's keys during the stop; blocked defendant's vehicle with their patrol cars, which defendant did not ask them to move; and momentarily drew one or more weapons on defendant when he exited his car); *United States v. Zellner*, Criminal Indictment No. 1:09-CR-320-TCB-GGB, 2011 WL 530718, at *7-8 (N.D. Ga. Jan. 14, 2011), *adopted by United States v. Chester*, Criminal Action File No. 1:09-cr-320-TCB-GGB, 2011 WL 529952, at *1 (N.D. Ga. Feb. 4, 2011) (defendants not in custody for *Miranda* purposes during a 30-45 minute encounter in a parking lot where there were multiple armed officers in "battle dress uniforms" with

13

dogs, the officers blocked defendants' vehicle from exiting the parking lot, the officers drew but never pointed their guns at defendants, the defendants were never handcuffed, the officers did not raise their voices and engaged defendants in a conversational tone, and the officers only touched defendants to perform a brief pat down for weapons).

The remaining factors also strongly support a conclusion that Jackson was not in custody. Thompson did not brandish his weapon, touch Jackson, or use language or a tone that indicated that compliance with him could be compelled. *See Street*, 472 F.3d at 1309. He was not physically restrained and the entire encounter was of very short duration. Although Thompson apparently possessed Jackson's bookbag, it was not searched prior to Jackson making his spontaneous statements. Jackson also was not personally searched. Thus, the totality of circumstances demonstrate that a reasonable innocent person in Jackson's position would not have understood his freedom of action to have been curtailed to a degree associated with formal arrest, and thus, Jackson was not "in custody" for Fifth Amendment purposes. *Luna-Encinas*, 603 F.3d at 881-82.

Accordingly, because he was not "in custody," Jackson was not entitled to *Miranda* warnings, and as a result, any statements that he allegedly made to Thompson only are not rendered inadmissible under *Miranda*.

*Conclusion*

For all of the above reasons, the undersigned **RECOMMENDS** that Defendant Jackson's motion to suppress statements, [Doc. 15], be **DENIED IN PART AND GRANTED IN PART AS MOOT**. Specifically, the motion should be **DENIED** as to the statements the government claims that Jackson made to Thompson alone–to the effect of "let it slide," it was not his gun, and it was Red's gun–and **GRANTED AS MOOT** as to his response to the question from either Thompson or Rosser as to where he got the firearm, which answer the government intends not to admit at trial.

The undersigned has now ruled upon all matters referred to it under Standing Order 14-02 (N.D. Ga. Aug. 15, 2014) that have not been deferred to the District Judge, and there has not been any report of any impediment to the scheduling of a trial. Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 20th day of February, 2018.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A (Rev.8/82)